P. O. WHEATON ET AL. *v.* HARLEY F. CUTLER.

January Term, 1911.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, AND POWERS, JJ.

Opinion filed May 27, 1911.

*Religious Societies—Merger of Corporations—Statutes—Acceptance—Licenses—Revocation—Estoppel—Permitting Sale of Land.*

No. 225, Acts. 1878, changing the name of the "Proprietors of the Congregational Meeting House" to the "Barre Congregational Society", and enlarging its powers so as to authorize it to hold and maintain a parsonage in addition to a house of public worship, was intended to legalize the merger into the Barre Congregational Society of the "Barre Parsonage Society", which was organized, and for about twenty years had existed, for the sole purpose of providing a parsonage for the use of the Proprietors of the Congregational Meeting House.

Where a parsonage society was organized, and for about twenty years had existed, for the sole purpose of providing a parsonage for the use of a church society, and during all that time had been practically merged in the church society, and thereupon No. 225, Acts 1878, legalized that merger and authorized the church society to hold and maintain a parsonage in addition to a house of public worship, and from its organization down to 1907, neither the parsonage society nor any of its trustees or members had attempted to act in relation to its property, nor objected to the church society dealing with it as its own, it will be presumed that the Act of 1878 legalizing the merger was accepted and acted on, and that the title to the land once owned by the parsonage society passed to the church society, and was properly conveyed by it.

A parol license to occupy land or to do acts thereon is revocable at law, regardless of whether it has been acted upon by the licensee; but in equity, such license, when acted on by the licensee, cannot be revoked where the revocation would amount to a fraud on licensee.

Where the occupants of sheds under a parol license from the owner have consented to hold the apparent position of lessees from year to year, and a purchaser of land on inquiry from the licensees is not informed of the true relation, but purchases the land in reliance on the apparent situation, the licensees cannot thereafter successfully invoke the aid of equity to enjoin the purchaser from terminating the licensee's occu-

pancy by more than six months notice to quit looking to the end of the year.

APPEAL IN CHANCERY, Washington County. Heard at Chambers on June 11, 1910, on the pleadings, findings of fact by the chancellor, and the orator's exceptions thereto. Exceptions overruled, and bill dismissed with costs to the defendant. The orators appealed. The opinion states the case.

*E. R. Davis, F. P. Carleton* and *E. M. Harvey* for the orators.

The orators have good title to the sheds in question as against the defendant, for mere occupancy of land, however recent, gives the possessor a title against every one who cannot show a better claim, and is sufficient to enable him to maintain an action against a stranger. He who is in the peaceable possession of land is regarded as the owner, except in a contest with one who has a better right. Waterman on Trespass, §909; *Look* v. *Norton*, 55 Me. 103; *Kilbourne* v. *Rewer*, 8 Gray 415; *Bilew* v. *Paisley*, 4 L. R. A. 840; *McGrady* v. *Miller*, 14 Vt. 128; *Austin* v. *Bailey*, 37 Vt. 219.

*John W. Gordon* for the defendant.

HASELTON, J. This is a bill in chancery brought by P. O. Wheaton and twelve others who claim to be the owners in severalty of certain horse-sheds upon land which the defendant claims to own by virtue of a deed from the Barre Congregational Church. The bill seeks to restrain the defendant from obstructing the way to and from the horse-sheds and from interfering with the orators in the enjoyment and possession of the sheds and their appurtenances. The case was heard by the chancellor, and on the facts found by him and the pleadings, the bill was dismissed with costs to the defendant. The orators appealed.

In 1841, an association was organized at Barre, under statutory provisions, for the purpose of building a house for public worship. It acquired land on the southerly side of the road now known as School Street in the City of Barre, and on

this land it built a meeting house. This association was called the "Proprietors of the Congregational Meeting House". About the time of the building of the meeting house, a row of horse-sheds was built by individuals on the land of the association, and their rights in the sheds were shortly confirmed by convey-ances from the association in the form of deeds none of which appear to have been recorded.

About the time of the formation of the Meeting House Association, there was formed, agreeably to the statutes, an association known as the Barre Parsonage Society, the object of which was to provide a parsonage for the use of the pastor of the Congregational Church at Barre. In 1842, this society took a conveyance of land with buildings thereon in the vicinity of the Congregational Church. The records of the Parsonage Society cannot be found and the society itself is now little more than a tradition among the members of the Congregational Church at Barre. The last known act of the Parsonage Society was a deed of a part of the parsonage land to the stewards of the Methodist Episcopal Church, a deed executed September 17, 1861. During all the period since, the Meeting House Society, under one name or another, has had full control and possession of the parsonage premises and has cared for, managed, and repaired the parsonage itself, exercising its control through its business committee and its Ladies Aid Society. In 1878, by No. 225 of the acts of that year, the name of the Meeting House Association was changed to the "Barre Congregational Society," and its powers were enlarged so that it was given the right to procure hold and keep in repair a parsonage, in addition to the right to hold and keep in repair a house of public worship. The enlargement of the powers of the organization was such as precisely to cover the powers which the Parsonage Society had been organized to exercise; and in view of the history which has been, or will be, herein recited, we think that this act of the Legislature was intended to legalize the merger, already practically effected, of the two organizations originally formed for a common or allied purpose. The word "Barre" was common to both organizations. The word "Congrega-tional" was taken from the name of the Meeting House Asso-

ciation and the word "society" was taken from the name of the Parsonage Association.

This construction of the act just referred to appears reasonable and natural in view of the policy of the Legislature which prevailed during the time that such a corporation as a "Parsonage Society" was recognized under that name by our statutes. During all that time the statute provided that one association might "embrace" the two objects for which the Meeting House Society and the Parsonage Society respectively were organized. R. S. 392; G. S. 580; R. L. 706.

All we know as to the membership of the Parsonage Association is that, when in 1861 that association conveyed to the stewards of the Methodist Episcopal Church, Justus Ketchum and Thomas Wilson assumed to act as trustees of the Parsonage Association.

In 1885, with a view to improvements upon the meeting house, the church, or society, arranged orally with the owners of the sheds to which reference has hereinbefore been made to remove such sheds onto the parsonage land, and they were accordingly removed in the same year.

Thomas Wilson, by vote, assented to this arrangement. Both Mr. Wilson and Mr. Ketchum were present when the sheds were moved and made no objection to their removal.

In 1886, by No. 240 of the acts of that year, the Legislature granted to the Barre Congregational Society the right to sell any of its property; and in the following year the society sold, with a warranty of title, a part of the parsonage land so called to Dr. C. E. Camp of Barre. In this conveyance the society reserved to itself and to the persons interested in the sheds, the right of passing and re-passing from a road which had come to be called Washington Street, to and from the sheds.

In 1888, by No. 127 of the acts of that year, the Legislature provided for the incorporation of any independent local church, and among other things, provided that any person or persons holding real or personal estate in trust for such church might convey it to the corporation, and that any religious society connected with a church which should become incorporated, might convey to the corporation any real or personal estate held for the use of the church.

In 1890, the Barre Congregational Church was organized under the provisions of this act and pursuant to its provisions the Barre Congregational Society quit-claimed to the Barre Congregational Church all its interest in the meeting house and lot and in the parsonage premises, and the Barre Congregational Church became the successor of the Barre Congregational Society.

In 1893, the Barre Congregational Church conveyed to the stewards of the Methodist Episcopal Church by warranty deed a portion of the parsonage premises.

Neither during these proceedings following the Act of 1878, nor at any time since 1861, does it appear from the case that the traditional Parsonage Society has acted in any matter, or attempted to do any act, or assumed, or asserted the right to act or to exist, or that any member thereof has at any time questioned the right of the Congregational Society or its successor, the Congregational Church, to exercise the full rights of ownership and alienation over the parsonage lands; and it must be considered, not only that the Act of 1878 was intended to legalize the merger of the Meeting House Society and the Parsonage Society, but also that it was accepted and acted upon, and that the Congregational Society, the predecessor of the Congregational Church, succeeded to the Parsonage Society, and became but another name for it, that the deeds to Dr. Camp and to the stewards of the Methodist Episcopal Church were executed by the proper grantor, and that at the time of the deed to the defendant Cutler, the church had, to the land which it thereby assumed to convey, all the title which the superseded Parsonage Society had once had.

At the time of the conveyance to the Methodist Church in 1893, some of the horse-sheds in question stood upon the land conveyed. These the Congregational Church moved onto parsonage land not conveyed. This was done without consultation with the shed owners and without objection on their part. In the same year, 1893, the church, by a vote regularly taken, instructed its business committee to rent the remaining parsonage land for horse-shed purposes to its church attendants on condition that the sheds be kept close and locked, and placed where the business committee might direct. The rent was

fixed at five dollars a year for the land occupied by or appurtenant to each shed. We have not recited the vote in terms but have given it its obvious construction and the construction which was given it by all parties concerned.

P. O. Wheaton, one of the orators, for a number of years collected the rents thus voted and turned them over to the church collector. All of the shed owners paid the five dollars a year demanded. But while some paid it as rent others made statements and protestations in connection with this payment such that certain individual cases need separate consideration.

No evidence was offered in support of the claims of six out of the thirteen orators. With regard to the claim of Josiah Gale, one of the orators, who died before the trial, but whose legal representatives appeared by counsel, nothing appeared except that he had owned and occupied a shed on the parsonage land ever after the sheds were placed there until the time of his death.

Lewis Keith, another of the orators, has the rights of an owner in a shed which was moved by the church without his knowledge at the time of the sale of a part of the parsonage land as hereinbefore recited. Since 1893 he has paid the five dollars a year in compliance with the action of the church then taken. It does not appear that he made any protest in the matter. He simply made his church subscription so much the less. In the absence of further findings with reference to the claims of the orators Gale and Keith, it must be taken that they were of the number paying and recognizing the five dollars a year as rent. The case of five of the orators remains to be considered.

P. O. Wheaton is the owner of one of the sheds and was a member of the church at the time the defendant took his deed. After the vote of the church in 1893, he paid the five dollars a year, but testified that he didn't pay it as rent, but that he told the business committee of the church that "they might call it rent." He reduced his church subscription by an equivalent amount. For four or five years he acted as the collector of rents from the other shed owners. Before the defendant took his deed he had various talks with this orator

about his shed rights but the latter claimed no rights except as lessee.

George E. C. Wheaton, one of the orators, owns one of the sheds. After the vote of 1893, he was called upon for the rent which he paid, saying that he was a contributor to the church and consenting that the five dollars "should be called rent" to aid in getting something for the church out of those shed owners who were not attendants upon the church. The defendant before he took his deed inquired of this orator as to his rights and elicited no information as to the claim here set up. This orator simply told the defendant that he didn't claim to own any part of the land and that he would remove his shed if the rest did. He made no claim inconsistent with occupancy as a lessee.

Lewis K. Averill, one of the orators, owns or has an interest in one of the sheds. He hasn't been a contributor to the support of the church for twenty-one years. He began paying the five dollars a year in 1904. He testified that he didn t pay rent but that the church kept insisting that he pay five dollars a year for the use of the land where his shed stood and that he finally complied with its demands to save trouble. The distinction which he made between paying rent and paying for the use of the land is not easily discernible.

John Averill, one of the orators, bought one of the sheds in 1890, for five dollars. In the same year he repaired another shed under an arrangement with its owner, his uncle, by which in consideration of so doing, Mr. Averill was to have the shed subject to the right of his uncle to use it while he lived. This orator, John Averill, has since 1890 been in possession of this shed and of the one which he bought. He was called upon to pay rent on the sheds and declined to pay rent, but said that his subscription for the support of the gospel was ten dollars and that the church "might call it shed rent" if they wanted to. From the time of the action of the church in 1893 down to 1907 when the defendant took his deed, a period of fourteen years, this orator paid ten dollars a year in lieu of his subscription.

Edwin Carleton, the last of the orators whose case requires special mention, owned a shed and was called on by the orator

P. O. Wheaton to pay rent thereon. Mr. Carleton told Mr.
Wheaton that the church had no right to demand any rent
and that he wasn't going to pay it; that the sheds were moved
to the parsonage land under an arrangement by which the shed
owners were to have the same rights that they had had before.
Mr. Wheaton, the collector of shed rents, replied to Mr. Carleton
that there were a good many out of the Church Society that
owned sheds there and were getting their use free and that the
church was taking this way to get something out of them.
Finally Mr. Carleton paid five dollars to the rent collector,
and did this from three to five times but in paying he always
insisted that he was not paying rent. He paid other sums
by way of direct subscription to the support of the church.

Before the defendant took his deed he inquired of Mr.
Carleton as to his rights. Mr. Carleton said to the defendant
that "what was satisfactory to the rest would be to him."
He didn't claim to the defendant that he had any interest in
the parsonage land, and it doesn't appear that he told the de-
fendant anything about the claimed rights which he had quite
fully explained to the collector of rents.

It sufficiently appears that all the shed owners, who were
orators and about whose claims anything is found, were willing
to let it go that they were lessees merely of the land on which
their sheds stood,—some for the purpose of aiding the church
in getting rent out of shed owners who were not interested in
the church, and some for one reason and some for another, and
it is expressly found that, ever after the action taken in 1893,
the church treated as rent the money received on its demands
for rent.

The defendant, before taking his deed, was diligent in as-
certaining what the rights of the shed owners were. He knew
and learned nothing of the oral agreement by virtue of which
the sheds were moved onto the parsonage land. He knew of
the occupation of the sheds by the shed owners for many years.
The defendant was acquainted with all the facts that the church
records disclosed, and these records showed the action of the
church in voting to rent parsonage land to the shed owners,
showed no objection to the vote and no subsequent action to
have the vote rescinded.

The defendant, before he took his deed, understood that the orators were paying rent for the use of the land on which their sheds stood, and knew of no rights in the orators except the rights of lessees, and he relied upon his understanding that they were lessees in purchasing the land.   He had no knowledge of the claim of some of the orators that they were not paying rent as such.

He took his deed subject to the rights of the owners of the horse-sheds, but he supposed that those rights were the rights of lessees only, and it sufficiently appears that all of the orators who have made any contention here had contributed to give the defendant the understanding of the matter which he in fact had and acted on, and that they did so with knowledge of his contemplated purchase.

The defendant took his deed of the church, June 3, 1907. June 20, 1907, he sent by mail a notice to each of the shed owners, and all the orators who testified admitted that they received the notice.   This notice was in brief a notice of the purchase and a notification that the horse-sheds must be moved off from the land by January 1, 1908.   This was a notice given with reference to the end of the rental year and given more than six months previous to that time.   It closed with a direction that all manure and refuse from the horse-sheds must be taken away immediately   on account of complaints to the defendant and on account of threats of legal proceedings under the health laws.

The facts found by the chancellor show that in moving their sheds to the parsonage land in 1885 under an oral agreement, and in their occupation for the next eight years, that is down to 1893, the shed owners were licensees merely, for under their oral agreement they acquired no interest in the land. Whether or not a mere license to occupy land or to do acts thereon is revocable after the licensee has acted thereunder is a much vexed question,  for it involves many considerations.   Such a license is, by the strict rules of the common law, revocable without reference to the situation in which the licensee stands, but in equity it is a well recognized principle that a licensor is estopped from revoking a license granted and acted upon, when the revocation would operate as a fraud upon the licensee. *City of Barre* v. *McFarland & Boyce*, 82 Vt. 310, 73 Atl. 577

*City of Barre* v. *Scribner,* 82 Vt. 301, 73 Atl. 574; *Western Union Telegraph Co.* v. *Bullard,* 67 Vt. 272, 277, 31 Atl. 286; *Olmstead* v. *Abbott,* 61 Vt. 281, 18 Atl. 315; *Clark* v. *Glidden,* 60 Vt. 702, 15 Atl. 358; *Allen* v. *Fiske,* 42 Vt. 462; *Adams* v. *Patrick,* 30 Vt. 516; *Hall* v. *Chaffee,* 13 Vt. 150, and note thereto by Judge Redfield.

But if a licensee consents to the substitution of the relation of landlord and tenant for that of licensor and licensee, equity is not concerned in perpetuating the latter relation; and if a licensee makes annual payments, and in doing so agrees that they may be treated as rent and they are so treated, and third persons change their situation in reliance upon an understanding so induced, or if a purchaser of real estate, occupied by one whose right or privilege of occupation rests in fact on a license, is, in making his purchase, led by such occupant to the belief that his occupation is that of a lessee, then, in such case, equity will not aid the occupant in the assertion of an irrevocable license; and by these propositions taken together the claims of the orators who made any claim before the chancellor are met.

So far as appears the most that the orators were entitled to by way of recognition from the defendant was to have their occupancy of the land treated as a tenancy from year to year. The defendant, as appears by the notice given, so treated their tenancy or occupancy, and the orators have failed to establish their claimed right to an injunction against the defendant.

*Decree affirmed and cause remanded.*